UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARSHALL AVIATION, LLC | : | CIVIL ACTION NO. |
| | : | |
| VS. | : | 303CV1013 (SRU) |
| | : | |
| AIG AVIATION, INC. | : | OCTOBER 31, 2003 |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

**I.    INTRODUCTION**

The Defendants, AIG Aviation, Inc., ("AIG") and The Insurance Company of the State of Pennsylvania, ("TICSP"), filed a Motion to Stay and Compel Arbitration, ("Motion") on October 9, 2003, to attempt to invoke an appraisal process in the instant matter.  The Plaintiff, Marshall Aviation, LLC, ("Marshall") respectfully submits this memorandum of law in opposition to the Defendants' Motion.

**II.    FACTS**

On September 4, 2002, Marshall purchased policy number LA 0199794-01, ("subject policy") issued by TICSP through a broker, Aviation Insurance Resources in Memphis, Tennessee. (See Exhibit C).

On November 14, 2002, during the course of an annual inspection by MJ Aviation, LLC of Marshall's Beech Baron 58, identification number N432DL, ("subject

aircraft"), its only aircraft, all of the equipment powered by electricity, such as the radar, and the wiring carrying such power, of the subject aircraft ("subject avionics") were subjected to a reverse polarity condition whereby electricity was caused to flow in the opposite direction as was intended. (See Exhibits A, B).  (While electricity in an aircraft normally flows into a given avionic component in the "front" and through a fuse, during a reverse polarity event electricity flows in through the "back" of the unit, damages its internal workings, then blows the fuse on its way out the "front.").

At the time the plane was subjected to the reverse polarity condition, it was unclear to all involved the significant extent of the damage caused to the subject aircraft. (See Exhibit C).

In order to fix the subject aircraft's electrical equipment, it was necessary to bring it to an avionics shop that could handle such a task. *Id.*  MJ Aviation, LLC attempted to repair the subject aircraft to meet the criteria of its Mandatory Equipment List, (M.E.L.). *Id.*  The subject aircraft was then flown to VIP Avionics, Inc., at Brainerd Airfield in Hartford, Connecticut. *Id.*

During the course of this normally uneventful ten minute flight from Danbury, Connecticut, to Hartford, Connecticut, one by one all of the avionic components of the

2

aircraft failed. *Id.* After keeping in constant contact with Air Traffic Control by portable UHF radio, the plane safely landed in Hartford. *Id.*

In May 2002, John Cherney, President of Marshall, achieved a significant step towards recognizing his goal to become the first United Parcel Service, ("UPS") employee to move from being a van driver to flying commercial aircraft for UPS by obtaining a rare night position at UPS that would allow Mr. Cherney to obtain flight hours during the day. At this time, as part of the requirements of applying for a commercial pilot position with UPS, Mr. Cherney needed approximately 900 "turbine" flight hours to be eligible. *Id.*

In July 2002, Tradewind Aviation, LLC, ("Tradewind"), made a proposal to Marshall, that if Marshall purchased a King Air aircraft that Tradewind would agree to lease such plane for an hourly fee. (See Exhibit D). Pursuant to figures compiled by Tradewind at that time, Marshall could expect to net $31,000 from the proposal on an annual basis. *Id.* Marshall intended to accept this proposal and begin performance in January, 2003. (See Exhibit C).

Around the time that the subject aircraft was damaged in November 2002, Marshall was seeking to sell the subject aircraft to a ready and willing buyer that it made

contact with and purchase a turbine aircraft that it had negotiated a reasonable price for, but for this occurrence. *Id.*

After the subject aircraft's flight to Hartford on November 14, 2002, when all avionics failed, Marshall initially contacted the insurer to MJ Aviation, LLC, Phoenix Mutual Assurance, Co. ("Phoenix") to arrange for payment of the damage due to the reverse polarity condition. (See Exhibit C). Marshall was told by John Cooley, adjuster for Phoenix, to just replace the fuses, fly it around and "see what happens." (See Exhibits C, F).

Marshall then contacted its own insurer, TICSP, through its aviation manager, AIG, in December, 2002, to obtain its assistance in adjusting this claim. (See Exhibit C). Marshall ultimately made contact with Tracy Reasoner, ("Reasoner") of AIG, who stated that he would take care of this claim quickly and seek indemnification from Phoenix. (See Exhibit C).

AIG or TICSP engaged the services of Al Ryan, ("Ryan"), to adjust the subject claim on or about January 3, 2003. (See Exhibits E, G). Ryan interviewed personnel at MJ Aviation, LLC, in Danbury, Connecticut, and inspected the subject aircraft in Hartford on January 13, 2003. (See Exhibit E).

Ryan subsequently drafted a report, ("Ryan Report") regarding his investigation dated January 20, 2003, that was apparently received by AIG on January 23, 2003. (See Exhibit E).

The Ryan Report stated that VIP had prepared a proposal ("January VIP Proposal") to replace the damaged avionic components for $50,234 with a credit given by VIP for what it believed at that time it could obtain for salvage. *Id.*

Along with detailing the significant damage known at that time, the Ryan Report also advised that Marshall was looking to upgrade to a turbine aircraft. *Id.*

On February 7, 2003, Marshall received an email from BendixKing-Honeywell ("BendixKing"), the manufacturer of the majority of the affected avionics from the subject aircraft, which indicated that since the avionics were exposed to the reverse polarity condition they would not be able to be recertified as safe for flight. (See Exhibit H). This denial by the manufacturer effectively eliminated any possible salvage value for the avionics from the subject aircraft. (See Exhibit L).

On or about February 7, 2003, AIG or TICSP arranged for Bernard Coogan, ("Coogan"), from AIRCO in St. Peters, Missouri, to inspect the subject aircraft. (See Exhibit F).

John Cherney and Robert Lenert of VIP were present at the inspection when Coogan noted the burnt smell of the avionics and stated that "the insurance company is not going to like what he [Coogan] has to say" regarding replacing the avionics in the subject aircraft. (See Exhibit C).

On that date, Coogan also recommended replacing significant elements of the electronic wiring system for the subject aircraft, which work was subsequently completed by Master Aviation in Danbury, Connecticut. (See Exhibits C, I, N).

On or about February 10, 2003, Coogan drafted a report to AIG, ("February Coogan Report"), that was apparently received by AIG on February 13, 2003.  (See Exhibit F).

With the receipt of the Coogan Report, AIG and TICSP became aware via the February Coogan Report of the fact that BendixKing would not recertify the majority of the avionics, that the fair market value of the plane was decreased by $77,000 dollars and that the fair market value of replacing the subject avionics was $120,000. (See Exhibit E, L).  AIG and TICSP also became aware at this time that Marshall had a buyer for the subject aircraft, that Marshall was planning to buy a King Air, and that such intended purchase was for the purpose of logging hours in a turbine aircraft so John

Cherney could apply for a flight engineer position at UPS, thus making time of the essence in repairing the subject aircraft. (See Exhibit E).

On or about February 27, 2003, Reasoner first made his intention known that he wanted the avionics to be inspected by a third entity, American Avionics, in Seattle, Washington. (See Exhibit J).

On or about March 5, 2003, Marshall provided AIG with a letter from Alan Speakmaster of Master Aviation in Danbury, Connecticut, explaining his opinion that all of the affected avionics in the subject aircraft must be replaced. (See Exhibit B).

On or about March 12, 2003, ("March VIP Proposal") Robert Lenert of VIP prepared a quotation for the like kind and quality replacement of the original avionic components affected by the reverse polarity condition. (See Exhibit K).  This quotation assumed that affected avionic components would be replaced with exactly the same component and model number, where possible. (See Exhibit L).  The estimated cost to replace all affected avionic components totaled $100,375.00. (See Exhibit K).

The March VIP Proposal was sent to AIG on or about March 13, 2003. (See Exhibit C).

On or about March 13, 2003, VIP sent the affected avionics to American Avionics. (See Exhibit M, T).  Prior to the transfer of the affected avionics, Marshall was

told by Coogan that the inspection process would take no longer than one week. (See Exhibit C).

On March 21, 2003, American Avionics tested several of the avionic components, and certified them as being safe for flight. (See Exhibit N).

After several weeks with no word from any AIG or TICSP personnel or agents, Marshall contacted American Avionics in late March, 2003. (See Exhibit C).  In that telephone conversation, a person identifying himself as Terry Hull, indicated that he was not told: (1) that the work needed to be completed as soon as possible; (2) that key electrical wiring, fuses and solenoids were replaced by VIP, possibly masking some of the effects of the reverse polarity condition; and (3) that the manufacturer of the majority of the subject avionics, BendixKing, had decertified them. (See Exhibit C).

On March 28, 2003, Marshall requested a copy of the Coogan Report. (See Exhibit M).

By letter dated April 23, 2003, Reasoner proposed to pay for some of the electrical work that was completed, while refusing other work, some of which had been directly ordered by Coogan. (See Exhibit O).  Part of the proposal included a sum of $7,000 to inspect and recertify the "undamaged" avionics subjected to the reverse polarity condition that were removed from the subject aircraft from BendixKing and

proposed sending the remainder of the equipment to their respective manufacturers for recertification. *Id.* Such letter included as an attachment a document entitled "Partial Proof of Loss." *Id.*

On or about April 28, 2003, American Avionics performed insubstantial inspections of the affected avionics, then sent the BendixKing components back to the manufacturer and the remainder to VIP at Marshall's request. (See Exhibits C, Q).

On or about April 29, 2003, Marshall obtained a loan for $20,000 at 10% interest to pay for overdue invoices from VIP. (See Exhibit C).

On May 1, 2003, Marshall notified AIG of the inadequacies of its proposal, of Marshall's intention to replace the subject avionics replaced at its expense, and of Marshall's intent to avail itself of all remedies available to it under law if a satisfactory result could not be reached promptly. (See Exhibit P).

On or about May 7, 2003, Coogan drafted a "follow-up" report, ("May Coogan Report"), to the February Coogan Report. (See Exhibit R).

On or about May 15, 2003, BendixKing stated regarding the subject avionics that "[u]nfortunately, with the nature of the damage we will not be able to repair and/or re-certify these units and recommend that you replace these units.  Honeywell does not repair units that have been exposed to reversed polarity voltage.  Reverse polarity

exposure results in decreased reliability, higher warranty claim costs for the customer and for Honeywell, reduced product life and degraded performance." (See Exhibit S).

Sometime between May 7, 2003, and June 5, 2003, Reasoner resigned his position with AIG. (See Exhibits G, R).

Marshall initiated the present litigation by complaint dated June 9, 2003.

On or about July 24, and 30, 2003, respectively, Marshall obtained two loans to pay for the installation of avionic components for the subject aircraft: (1) loan for $21,795.00 at 10% interest; and (2) a loan for $50,000.00 at 8 % interest. (See Exhibit C).

John Cherney has only been able to obtain 250 of the 800-1000 turbine hours by September 30, 2003, necessary to apply for the UPS position despite his efforts to obtain turbine hours in another turbine aircraft. (See Exhibit C).  On October 1, 2003, John Cherney returned to work full time after flying full-time during the month of August pursuant a leave of absence granted by UPS for that purpose. *Id.*  The position that John Cherney had obtained with UPS that allowed him to work only nights by annual contract has been overtaken by a person more senior than he; thus from October 1, 2003, through the end of the contract year in 2004, John Cherney must work a day shift for UPS that will not allow him to obtain sufficient additional turbine hours. *Id.*

On or about October 9, 2003, the Defendants filed the instant Motion.

III.    **ARGUMENT**

A.    **TICSP Has Waived Its Right To Demand An Appraisal.**

By its conduct in causing unnecessary expense and delay to the Plaintiff, TICSP has waived its right to compel the appraisal process. No bright line exists to determine whether waiver has occurred so courts must make factually specific inquiries into the individual circumstances of the case. Any invocation of an appraisal clause must be reasonable under the circumstances and made within a reasonable time. The most important factor in evaluating a claim of waiver is the prejudice caused to the party opposed to invoking the relevant clause.

1.    **Court Must Make Factually Specific Inquiry Into Individual Circumstances in Finding Prejudice to Marshall's Economic Interests.**

The inquiry this Court must conduct requires it to sift through the evidence presented at this stage in the litigation for an individualized consideration of the economic prejudice to Marshall. Such analysis regarding whether one party's actions prejudiced another party's economic interests "is factually specific and not susceptible to bright line rules." Thyssen, Inc. v. Calypso Shipping Corp., 310 F.3d 102, 105 (2d Cir. 2002) *quoting* Cotton v. Slone, 4 F.3d 176, 179 (2d Cir. 1993). The court in Kramer v. Hammond, 943 F.2d 176 (2d Cir. 1991), evaluated a claim of prejudice in a New York

11

lawsuit when a litigant invoked an arbitration clause after substantial litigation
expenditures in a different jurisdiction where a related action was brought but where
insubstantial litigation was prosecuted in New York.  The *Kramer* court reversed a lower
court's ruling that insufficient prejudice existed where a district court granted a motion to
compel arbitration "in a handwritten, one sentence endorsement" "stating that there was
'an insufficient showing of 'waiver' to rebut the policy favoring arbitration" where the
party claiming to invoke an arbitration clause had engaged in long and costly discovery
in another jurisdiction "apparently designed to wear down his opponent." *Kramer*, 943
F.2d at 178, 179.  In arriving at its decision, the court conducted a thorough analysis
and weighing of the significant financial costs from the litigation in a foreign jurisdiction
as against the "substantive" prejudice to the party opposing the invocation of an
arbitration clause after an answer was filed by the party invoking the arbitration clause,
but apparently before significant discovery in the New York case. *Id.* at 179.  The instant
matter is factually complicated and deserves thorough consideration by this court.
While this litigation has not seen exhaustive pre-trial discovery and motion practice, the
actions of AIG and TICSP by delaying the processing of this claim continue to wreak
severe financial havoc on Marshall. (See Exhibit C).  Therefore, this court should not
only consider the "static" loss under the policy by defendants failure to pay to replace

the subject avionics with those of like kind and quality, but also the <u>continuing</u> damage

caused by Marshall's present obligations of debt service on its loans to pay for avionics

installed in the subject aircraft, Marshall's lost income, and the frustration of Marshall's

expectation of application for a flight engineer position at UPS in evaluating the

economic prejudice to Marshall's interests.

      **2.**    **TICSP Did Not Properly Invoke The Appraisal Provision In a Timely and Reasonable Manner.**

TICSP waived its right to compel an appraisal by <u>never</u> effectively invoking the

appraisal clause, much less in a timely and reasonable manner.  An invocation of an

appraisal clause must by timely and made in a reasonable manner under the

circumstances. <u>Kester v. State Farm Fire and Casualty Company</u>, 726 F.Supp. 1015,

1019 (E.D. Penn. 1989) *citing* <u>Keesling v. Western Fire Insurance Company of Fort

Scott Kansas</u>, 10 Wash.App. 841 (1974).  The Arizona Supreme court in <u>Meineke v.

Twin City Fire Insurance Company</u>, 181 Ariz. 576 (1995) held that in a claim where the

insurer waited an additional two months after an impasse in the negotiation of a claim

and the insurer had already paid nearly $500,000.00 dollars on a claim, that the insurer

had waived its ability to invoke an appraisal clause in the policy.  The court was

concerned about the possibility that insurers could attempt to manipulate the process to

gain procedural advantage and looked closely at the time sequence of discussions of

the parties to determine if a finding of waiver was appropriate. *Id.* at 582-83.  In the

instant case, the claimed invocation of the appraisal provision of the policy arguably has

not occurred since the appraisal procedure has not been complied with by TICSP.  The

procedure described in paragraph 4 on page 8 of the policy entitled "Appraisal of Loss,"

clearly requires there not only to be an "amount of loss" submitted by TICSP, but also

that any party seeking to invoke the appraisal provision "will hire at its own expense an

independent aircraft appraiser." (See Exhibit U).  TICSP has not complied with this

provision because it has only submitted a "partial proof of loss" to the Plaintiff, has not

appointed an "independent aircraft appraiser," and has not effectively invoked the

clause.

        In addition to these procedural defects, any claimed invocation of the appraisal

clause was not timely or reasonable in the context of the facts of this case.  The first

adjuster to view the subject aircraft forewent his usual report because he apparently

didn't think it was appropriate since it was "pretty straight forward" that the claim should

be paid. (See Exhibit E).  Similarly, both Ryan's Report and Coogan's February Report

noted that the avionics needed to be replaced and that time was of the essence as

Marshall was looking to sell the subject aircraft and upgrade to a King Air. (See Exhibits

E, F).  Instead of paying the claim that both of AIG's adjusters thought should be paid

despite the significant expense involved, and notably after learning: (1) that the subject avionics were decertified by their manufacturer (See Exhibit B); and (2) the opinion of both Robert Lenert of VIP and Alan Speakmaster of Master Aviation, LLC that the subject avionics be replaced, ("Master") (See Exhibits H, L), Reasoner requested the unusual step of having all the avionics sent across the country to American Avionics in Seattle, Washington on or about March 13, 2003 (See Exhibit M). Although it was originally represented to Marshall by Coogan that such "inspection" would take one week, Reasoner did not provide any written response until its attempted request to "recertify" the subject avionics on April 23, 2003, along with submitting a partial proof of loss for such action. (See Exhibits C, O). Reasoner's insincerity is underscored by his representation in the above letter that "initial testing of our insured's equipment [was completed] and no defects were noted" and that the components were "undamaged" apparently after only four of the subject avionic components had been tested in any way *prior* to April 23, 2003, and the testing of the components listed in Exhibit N was done without the knowledge that fuses and solenoids had been replaced, thereby potentially masking the effects of the reverse polarity event. (See Exhibits C, N, Q). AIG's much belated and grossly inadequate attempt to invoke the appraisal clause, made <u>after</u> the initiation of this lawsuit on June 9, 2003, (and plausibly without authority as per the

terms of the policy as arguably TICSP must invoke the clause), did not occur until June

12, 2003. (See Exhibit G).  As the instant lawsuit appears to have prompted the June

12, 2003 letter from AIG, it is unclear that AIG ever would have attempted to invoke the

clause absent the initiation of litigation.  As TICSP has not appointed an appraiser as of

the present date, it has not properly invoked the appraisal clause and cannot be

considered to have done so in a timely manner.  While it may have been proper to

invoke the clause to determine the value of the loss in February 2003, when AIG

apparently did not want to follow the advice of its adjusters to pay the claim, AIG's much

belated and apparently insincere attempt to invoke the clause in June 2003, was neither

timely, reasonable nor effective.

    **3.**    **TICSP's Substantial Delay In Attempting to Invoke the Appraisal
Process Prejudiced Marshall's Economic Interests.**

      The delays caused by TICSP's failure to properly invoke the appraisal process in

a timely and reasonable manner have severely prejudiced Marshall's economic

interests.  "The key to a waiver analysis is prejudice." *Thyssen*, 310 F.3d at 105.  When

a party takes too long to attempt to invoke its right to an appraisal and "thereby causes

his adversary to incur unnecessary delay or expense" to his or her prejudice, such party

is fairly held to have waived such a right. Com-tech Assoc. v. Computer Assoc., 938

F.2d 1574, 1576 (2d Cir. 1991).  The court in Leadertex, Inc. v. Morganton Dyeing &

Finishing Corp., 67 F.3d 20 (2d Cir. 1995), considered a claim where a substantial

economic injury was continuing to be caused to the party opposed to the invocation of

an arbitration process while the litigation was in its discovery stage.  After a dispute over

payment for allegedly inferior goods, the defendant in *Leadertex*, detained nearly all of

the plaintiffs working inventory prior to the initiation of the lawsuit thereby allegedly

causing a ninety percent decrease in the plaintiffs business. *Id.* at 24.  The court held

that where the party presently seeking to enforce an arbitration clause had caused and

continued to cause economic prejudice to its adversary by its delay in invoking such

clause, that such party waived its right to compel arbitration. *Id.* at 27.  In the instant

case, TICSP's failure to promptly invoke the appraisal clause of the policy has caused

severe economic prejudice to Marshall's interests since at least February, 2003.  As a

direct result of TICSP's failure to properly invoke the appraisal clause, the subject

aircraft did not have functional avionics installed until August, 2003 (See Exhibits C, L);

this installation was done out of a concern of Marshall's that allowing the subject aircraft

to remain idle too long would cause additional damage.  As is evidenced by the Ryan

Report and the February Coogan Report, AIG and TICSP were aware in January, 2003,

that Marshall's sole member, John Cherney, sought to obtain flight hours in a turbine

aircraft, that Marshall needed to sell the subject aircraft, and that it had a buyer if the

subject aircraft could be repaired adequately. (See Exhibits E, F).  As a consequence of

the plane not being repaired in a timely manner, it is impossible for John Cherney to

obtain the necessary turbine flight hours by the end of 2003, despite his best efforts to

mitigate his damages by flying on weekends and taking an unpaid leave of absence

from UPS (and his family) to acquire more turbine hours with a charter contract in

Florida. (See Exhibit C).  Marshall was also foreclosed from an anticipated revenue

stream since it was prevented from selling the subject aircraft and purchasing a King Air

turbine propelled aircraft for which it had a valid lease-back proposal ("Proposal") from

Tradewind Aviation, LLC ("Tradewind") (See Exhibits C, D).  In addition to granting

Marshall access to a turbine aircraft to build turbine hours without paying for rental and

wages for piloting such aircraft for Tradewind, Marshall would receive approximately

$31,000 in net income from Tradewind from such proposal. (See Exhibit D).  The lost

opportunity to acquire more turbine hours, wages and income are damages above and

beyond the interest charges Marshall pays monthly on loans obtained for electrical work

and avionics for the subject aircraft that carry interest charges of nearly $700.00 per

month. (See Exhibit C).

     Consideration of these presently occurring damages alone should suffice to

justify this court finding that TICSP has waived its right to appraisal.  As will be more

thoroughly discussed in the following section regarding the scope of the appraisal clause, the issues presented in this matter are not capable of being resolved with the appraisal clause so granting a stay of this litigation will only serve to further prejudice Marshall without any benefit.  Furthermore, TICSP should not be given the undeserved advantage of being able to further delay payment of a loss for which it has already accepted liability for with the present Motion. *Kester*, 726 F.Supp. at 1017 (Party admits liability when it invokes arbitration clause). Therefore, the severe and substantial prejudice to Marshall's economic interests caused by TICSP's failure to properly invoke the appraisal clause should not be compounded and the Defendants' Motion warrants denial.

**B.    TICSP's Breaches of the Covenant of Good Faith and Fair Dealing and Unfair Trade Practices Are Beyond the Scope of the Appraisal Clause.**

TICSP's actions and inactions that violate the implied covenant of good faith and fair dealing and unfair trade practices demonstrated by its conduct towards Marshall are subject areas that the appraisal clause was not intended to address.  Since the appraisal clause was only intended to determine the amount of the loss upon disagreement of the parties, its use should not be compelled for issues beyond its scope.  As AIG is not a party to the subject policy, it has no right to invoke the appraisal clause.

### 1.    The Appraisal Clause in the Subject Policy Is Limited to Valuation of a Loss.

This court should deny the Defendants' Motion because the Appraisal clause does not relate to the Plaintiff's allegations of bad faith and unfair trade practices. Whether a party has agreed to submit to a non-judicial means of resolution of issues is a matter of contractual interpretation regarding the intent of the parties. *Leadertex*, 67 F.3d at 27. The court of appeals in <u>Hartford Lloyd's Insurance Company v. Teachworth</u>, 898 F.2d 1058, 1061-62 (5th Cir. 1990) discussed the differences between arbitrations and appraisals:

> In contrast, an appraisal determines only the amount of the loss, without resolving such issues as whether the insurer is liable under the policy. Additionally, an arbitration is a quasi-judicial proceeding, complete with formal hearings, notice to parties, and testimony of witnesses. Appraisals are informal. Appraisers typically conduct independent investigations and base their decisions on their own knowledge, without holding formal hearings." *Teachworth*, 898 F.2d at 1062 *citing* R. Keeton & A. Widliss, *Insurance Law* § 9.6 (1988).

None of the authorities cited by the Defendants in their Motion consider an appraisal clause similar to the clause in the subject policy. Those cases all consider broad "arbitration" clauses that relate to "[a]ny controversy or claim arising under or in relation to" the contract between the parties. *Leadertex*, 67 F.3d at 27; *See also* <u>Genesco, Inc. v. T. Kakiuchi</u>, 815 F.2d 840, 845 (2d Cir. 1987); <u>Hutchinson v. Farm Family Casualty</u>

20

Insurance Company, 2000 WL 435443 (D.Conn); Hinson v. Jusco Co., Ltd., 868

F.Supp. 145, 145 (D.S.C. 1994).  However, the Second Circuit has rejected the

requirement that all allegations that "touch matters" related to a contract, even where a

broad arbitration clause is contained within a contract, because such criteria does not

yield a "principled way of here deciding whether these claims should be sent to

arbitration." *Leadertex*, 67 F.3d at 28.  In the instant matter, the operative complaint

states allegations of TICSP's breach of the covenant of good faith and fair dealing and

unfair trade practices under the Connecticut Unfair Trade Practices Act ("CUTPA") that

cannot be properly categorized under the rubric of determining the amount of a loss

under an insurance policy.  Therefore, the application of the appraisal clause to stay

issues not fairly within the scope of such provision would be inappropriate.

   2.    **Stay is Inappropriate as to AIG as it Has No Agreement With Marshall
         to Submit Any Issues to an Appraisal Process.**

      As AIG does not have a contract with Marshall it cannot invoke the appraisal

process.  A party does not have standing to invoke a provision of a contract to which it

has not signed nor was intended for its benefit. Shearson Lehman Hutton, Inc. v.

Wagoner, 944 F.2d 114, 118 *citing* Warth v. Seldin, 422 U.S. 490. 498-99 (1975).  The

pronouns "we" and "us" are defined in the policy to relate to TICSP; AIG only has the

specific authority under the policy as the aviation manager. (See Exhibit U).  According

to the language of the subject policy, TICSP is the only party that can properly invoke the appraisal clause as it is a signatory party to the policy. *Id.* Accordingly, AIG has no standing to invoke the appraisal clause; to the extent that AIG is separately moving to compel arbitration and stay these proceedings, such a request is unfounded and inappropriate.

## III.     CONCLUSION

WHEREFORE, for all the foregoing reasons, the Plaintiff respectfully requests that the court deny the defendants Motion to Compel Arbitration and Stay Proceedings.

PLAINTIFF,
**MARSHALL AVIATION, LLC**


JONATHAN E. SNYDER
Gordon, Muir and Foley, LLP
Hartford Square North
Ten Columbus Boulevard
Hartford, CT 06106
(860) 525-5361
Federal Bar No. ct22572

**<u>CERTIFICATION</u>**

I hereby certify that a copy of the foregoing Interrogatories and Requests For Production were mailed, first class, postage prepaid mail, on October 31, 2003, to:

Steven R. Arnold, Esq.
Stanger & Arnold, LLP
29 South Main Street, Suite 325
West Hartford, CT 06107


---------------------------------------
JONATHAN E. SNYDER

::ODMA\PCDOCS\DOCS\347368\1