

# AVIATION MANAGEMENT CONSULTING, INC.
## AMC\VALUE$
### CERTIFIED APPRAISAL SERVICES

August 23, 2004

United State District Court
District of Connecticut

Marshall Aviation, LLC, Plaintiff
vs.
AIG Aviation, Inc. and
The Insurance Company of
The State of Pennsylvania, Defendants

Civil  No. 303CV1013 (SRU)

## <u>Arbitration Findings and Agreement</u>

On August 2nd and 3rd, 2004 in Rockford, Illinois I conducted an arbitration process with Messers Frederick L. Wilken and Bernard J. Coogan.

This arbitration was conducted to determine an avionics damage evaluation as a result from a reverse polarity incident due to mis-installed batteries (reversed battery cables).

In an effort to reach a fair and equitable evaluation the two parities presented both their views and arguments.  Both parties presented professional and well orchestrated positions all though be it they are advocates.

Utilizing USPAP, Uniform Standards of Appraisal Practice and Advisory Options 2004 Edition and focusing on the Cost Approach Methodology, our arbitration produced the following agreement:

*All participants agreed that an amount of **<u>$74,802.70</u>** is a fair and equitable amount for the avionics damages inflicted to the 1974 Beech Baron 58, Serial Number 561, N432DL.  Additionally this would include all salvaged avionics, racks, trays and installation provisions being returned to the AIG Aviation.*

*Exhibit A*

" If It Touches Aviation"
CERTIFIED APPRAISALS - UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE
3645 FOXBOROUGH LANE • ROCKFORD, ILLINOIS 61114-7062 • OFFICE (815) 633-1684
FAX (815) 633-1696

Page 2

I certify that, to the best of my knowledge and belief:
- ➤ The statements of fact contained in this letter are true and correct.
- ➤ The reported analyses, opinions, and conclusions are my personal, impartial, and unbiased professional analysis, opinions, and conclusions.
- ➤ I have no present or prospective interest in the property that is the subject of this letter and no personal interest with respect to the parties involved.
- ➤ I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
- ➤ My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- ➤ My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of any parties involved, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this conclusion.
- ➤ My analyses, opinions, and conclusions were developed, and this letter has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice* 2004 Edition.
- ➤ I have not made a personal inspection of the Baron that is the subject of this report.

Any questions or additional requirements should be forwarded to me at (815) 633-1684 office; (815) 621-9494 mobile; or KEN4GPS@aol.com.

Sincerely,

Kenneth M. Dufour, ASA, ATP, MAM
Accredited Senior Appraiser
American Society of Appraisers

President/CEO
Aviation Management Consulting, Inc.

KMD/ad



Prepared exclusively for the Plaintiff (see p. 2)

| | | |
|---|---|---|
| L. 9:53 | 1 | your sequence of events is out of order.  He made this |
| 15:59:55 | 2 | recommendation and then we had a discussion about it and |
| 15:59:57 | 3 | then we ultimately took a position that we were going to |
| 16:00:02 | 4 | offer to pay what was indicated under the contract.  In |
| 16:00:04 | 5 | other words, just to repair the equipment that was damaged. |
| 16:00:10 | 6 | Q.   Okay.  Now, what I want to ask you is can you show |
| 16:00:15 | 7 | me in your claim file or anywhere where there is a $7,000 |
| 16:00:20 | 8 | repair estimate from American Avionics? |
| 16:00:26 | 9 | A.   I don't think so. |
| 16:00:28 | 10 | Q.   There isn't one, is there? |
| 16:00:30 | 11 | A.   I don't know, to be honest.  I haven't mined the |
| 16:00:36 | 12 | file for that reference. |
| 16:01:08 | 13 | MR. O'BRIEN:  Will you mark this as 42, please. |
| 16:01:11 | 14 | (Exhibit No. 42 marked for identification.) |
| 16:01:20 | 15 | MR. O'BRIEN:  Off the record for a second. |
| 16:01:26 | 16 | (Recess at 4:01; resumed at 4:13.) |
| 16:13:38 | 17 | BY MR. O'BRIEN: |
| 16:13:50 | 18 | Q.   Mr. Grady, 42 is a letter from Mr. Reasoner to me |
| 16:13:54 | 19 | dated April 23, 2003.  Now, in the second paragraph, he |
| 16:14:02 | 20 | says, "American Avionics, Inc., has completed the initial |
| 16:14:07 | 21 | testing of our insured's equipment and no defects were |
| 16:14:12 | 22 | noted.  More rigorous testing will be required to re-certify |
| 16:14:17 | 23 | the equipment and the preliminary estimate for this is |
| 1  4:21 | 24 | $7,000." |
| 16:14:25 | 25 | Now, would you agree with me that what |

# Ryan Insurance Services, Inc.
## RYCO Aviation, Inc.

Telephone (207) 284-2200
FAX (207) 282-8362
E-mail: claims@ryanins.com

87 Landry Street
Biddeford, Maine 04005-4332

January 20, 2003

Mr. Tracy Reasoner
AIG Aviation of Arizona
7047 East Greenway Parkway, Suite 350
Scottsdale, AZ 85254

Dear Tracy:

    RE: Marshall Aviation, LLC
       File # HG02500

This case is pretty straightforward and, in the interest of brevity, I'm going to forego the full captioned report.

Our assured has a 1974 Beech Baron 58 (N432DL) which he has based at Danbury, CT (DXR) and which he had in to L J Aviation, LLC at DXR for an annual inspection in November. The A & P who worked on the airplane was Louis Pugliese, Jr., who later bought the business and now operates under the name M J Aviation, LLC. At the time of this loss, however, L J was and, under M J, continues to be insured in Phoenix Aviation Managers, Inc. with Grohs Aviation as the agent.

Following the annual inspection, L J reinstalled the aircraft battery and inadvertently installed it backwards so that the positive terminal was connected to ground and the negative terminal connected to the positive lead. No one caught it, and when I visited with Lou Pugliese at M J on January 13th to inspect the aircraft logs and interview him, he readily admitted the error. What occurred was that the engines were started on the ramp for leak checks and, while running, smoke started to emerge from the avionics stack. They discovered the error, but not before several of the avionics were either damaged or destroyed. Mr. Cooley advised Mr. Pugliese not to give any statement in writing or recorded, but Mr. Pugliese spoke with me freely in admitting the error.

The loss was reported to the Phoenix immediately through agent, Bill Grohs, and John Cooley, the resident claims representative, began to handle. Unfortunately for Mr. John Cherney, the owner of Marshall Aviation, he ran into Mr. Cooley's rather aggressive nature and was unable to get anything done until the loss was reported to us under his hull coverage. While Mr. Cooley accepted liability in discussions I had with him, he told Mr. Cherney that he had problems with paying for the replacement of the radios, insisting instead that they be used with replaced fuses to "see what happens".

*Exhibit C*

*In Service Since 1984*
Member, National Association of Independent Insurance Adjusters
Member, Organization of Flying Adjusters
Member, Southern Maine Claims Association
Member, Aviation Insurance Association

Mr. Tracy Reasoner
File # HG02500 (Marshall)
Page 2

Failing that, he had the names of two shops in Pennsylvania where Mr. Cooley resides and works, and he wanted Mr. Cherney to take the airplane there. However, following the loss, the airplane was flown to Hartford to VIP Avionics for evaluation and possible repair. The avionics had been removed and bench-checked along with other systems, and it would have meant reassembling the airplane for flight with questionable commo and Mr. Cherney refused to do that. Mr. Cooley essentially refused to do anything more with the claim, according to a very upset Bill Grohs, the agent.

I'm told by Mr. Cherney that the airplane suffered unexplained but temporary electrical failure during the flight to Hartford; Mr. Cooley knew about this and mentioned it during our conversation about the loss. Mr. Cooley expressed a very negative attitude concerning Mr. Cherney and VIP Avionics, saying that VIP had only their own interests at heart and wanted to replace the avionics and other damaged components to protect themselves rather than attempt bench repairs and reinstallation. Mr. Cooley said he wasn't going to pay for that.

I visited with Rob Lenert at VIP and he later provided to me via email a list of items which were bench checked and the results of that inspection. There were mostly blown fuses in most of the units, though several units were burned such as the audio system amplifier and the auto pilot and compass system transistors.

What they propose and have provided a list for is a complete replacement of the avionics with factory overhauled units on an exchange basis; a proposed list is attached from VIP which totals $50,234 exchange. This does not include labor to do the work and I have asked VIP for a total estimate.

Mr. Cherney wanted to point out that these were not new avionics but replacement with like kind and quality using the damaged units for the exchange. He feels that until this is done, the airplane will not be resaleable, certainly not to a Part 135 operator.

I was a little troubled by John Cooley's apparent attitude when he called me – he doesn't like VIP because he sees them as trying to protect their interests by trying to do more than Mr. Cooley thinks should be done on this loss; and says he has problems with his own insured, though he did then state that he would accept the liability. I had that conversation with him on January 14th and it was during that conversation that he related the fact that the electrical system dropped off line unexpectedly during the Danbury to Hartford flight which would have taken about 15 minutes in that airplane.

I have informed Mr. Cherney that my role is as a fact gatherer for you, but that I would convey his concerns about sales attempts – he is looking to upgrade to a King Air – and would also convey his concern about not being no longer comfortable flying IFR with an electrical system that goes off line in flight, and with avionics with unknown life expectancy. His concern is that if he's in IMC or on top of a cloud deck when this occurs, the results could be rather serious.

Ryan Insurance Services, Inc.

Mr. Tracy Reasoner
File # HG02500
Page 3

I note in the list VIP gave me that the only problem with some of the units seemed to be blown fuses with no corresponding damage to the unit. Isn't that what fuses are supposed to do, after all – protect the unit against damage in case of an electrical anomaly? VIP has given a written statement saying that the units could be repaired but that lifespan could only be determined as units fail. VIP recommends replacing with like parts numbers and using reconditioned equipment. That's the opinion that Mr. Cooley and the Phoenix have problems with.

Enclosed is a copy of the aircraft logs; a reading of the logs showed that most of these avionics were installed October 1991, so they're not that old as aviation goes. Also attached are the photos I took of the airplane in its current state inside VIP's hangar. They have also billed us a month's inside storage which I would expect them to void once the extent of the job is agreed with our assured and they have begun the repair. They also have given me an invoice for the work to date which amounts to $1,860.30 which is mostly diagnostic in nature.

Finally, I have an invoice from M J Aviation for the repair of the airplane and that invoice includes a statement that the battery was installed backwards which resulted in the blowing of the voltage regulators and current limiters. However, since they did the deed, I would not expect to have to satisfy this invoice in any case.

I have also sent to you by email a procedural question regarding rental reimbursement which the policy seems to provide. We will no doubt solve that question before this package arrives at your office.

Thanks for asking me to see this airplane which is in show-room condition – inside and out. I have made no commitments to the assured or to any of the shops, nor have I given any opinions relative to this file in accordance with your instructional letter of January 3rd.

Best regards,

Allen A. Ryan, CCLA

AAR:dmp
Encl

**Accident**
**Investigation &**
**Research Co.**

Aviation Safety Consulting,

Accident Investigation,

Safety Surveys

257 Spencer Road
P O Box 818
St. Peters, MO 63376
(636) 928 3850
(800) 441 5302
EMAIL: FLYAIRCO@AOL.COM
FAX: (636) 928 0194

# AIRCO

10 February 2003

AIG Aviation
Attn: Tracy Reasoner
7047 Greenway Parkway, Suite 350
Scottsdale, AZ 85254

Re: Reverse polarity damage to Beech Baron, N432DL
    Insured:      John Cherney / Marshall Aviation LLC
    Claim #:      HG02500
    Date of Loss:  14 November 2002
    AIRCO #:     203277

Dear Tracy:

After your call of 5 February 2003 I contacted the insured's Attorney, Robert O'Brien, telephone 860 525-5361, and arranged a meeting, with John Cherney, at VIP Avionics, for the morning of 7 February 2003. Prior to that meeting I spoke to Al Ryan several times to obtain additional background on the mishap and resultant troubleshooting. Rob Lenert, of VIP Avionics, was present during the discussions with the insured.

Al Ryan briefed me on his understanding of the sequence of the mishap. Therefore, I have made no independent inquiry of Lou Pugliesi, the responsible mechanic at Danbury Connecticut. My understanding is that Lou Pugliesi installed the batteries backwards following work done during an annual inspection. It uses two twelve volt batteries, wired in series, to energize the 24/28 volt system. During a run-up of the engines, to check for leaks, with the avionics master switch off, he notice smoke coming from the instrument panel. After some preliminary trouble shooting the reversed battery problem was discovered and some of the radios were made operative (transponder & Com) by replacing internal fuses. John Cherney then flew to aircraft (VFR) from Danbury to Hartford-Brainard field. During that flight the transponder again failed. The failure turned out to be a result of the replacement fuse blowing. Also during that flight John Cherney said that he had an intermittent loss of all electrical

*Exhibit D*

power. Fortunately he carried a hand held VHF radio for communicating with the tower at Hartford.

John was anxious to use the aircraft to fly friends to Virginia for a wedding. Therefore, he flew it back to Danbury for additional repairs in an attempt to make it airworthy for the intended flight. Lou Pugliesi reportedly replaced the voltage regulators and current limiters plus additional fuses in some of the avionics. Initially the electrical system was checked on the ground and seemed to function normally except for a whining noise in the pilot's headset (the speaker and co-pilot headset are inoperative). This type of whining noise is usually a result of damaged diodes in one or both alternators. It is likely that they were damaged in this mishap.

During the return trip to Hartford, John Cherney again reported intermittent loss of electrical power. Ground inspection revealed a burned wire at one of the solenoids in the basic electrical system near the batteries. That wire was later replace by VIP Avionics. However, that burned wire, which occurred after VIP inspected the aircraft initially, is probably the result of a short circuit in another undefined location.

**INSURED**:

Unfortunately John Cheney has little understanding of the aircraft systems and had difficulty explaining the symptoms he encountered.

John is a 37 year old commercial pilot with 5 year old twin boys who frequently fly with him. He has a little over 1000 hours total time and about 400 hours in this Baron. His aspiration is to be a pilot for UPS, his employer for the past 15 years. John drives a truck for UPS and hopes to be the first pilot to "come up through the ranks" for UPS. He needs an additional 800 hours of turbine time to be hirable initially as a flight engineer. He claims to have had the aircraft sold for $300,000 but for this incident. That sale is still viable if the aircraft is repaired "adequately". John had owned a Seneca I previously and claims no prior insurance problems or claims. He plans to purchase a King Air C-90 for use in an existing Air Taxi operation in order to build turbine time.

**AIRCRAFT**:

N432DL is a 1974 Beech 58 Baron with 1900 hours total time and 250 hours on the IO 520 remanufactured engines. The paint is about two years old and the aircraft is in exceptionally good condition. It is normally aspirated and does not have built-in oxygen nor air conditioning. Prior to this mishap the aircraft had a fair market value of approximately $227,000. In its present condition it is worth about $150,000

2

The avionics package was installed about 10 years ago.  The current cost of this group of avionics would be approximately $120,000 including the autopilot and radar.  John said that his only prior avionics squawk was an autopilot servo which required frequent cleaning and was replaced by an updated unit.  That servo was not damaged in this mishap because the autopilot was not engaged.

The only non-standard facet of the avionics is an after market relay matrix system which connects the #1 and #2 nav radios to the HSI.  This will need to be rebuilt or replaced with a different style unit.  The avionics are now removed and stored in the back seats of the aircraft.  Some of the units have an odor of burnt wiring or insulation.

## ANALYSIS:

My first concern was whether or not a reverse polarity had actually occurred and why any radios were damaged when the avionics master switch was reportedly off.

Examination of the battery box shows that it can easily accommodate the batteries connected in a reversed condition by crossing the connecting cables at the battery terminals.

My next concern was whether or not the DC starter motors would operate normally with reverse polarity.  To resolve this question I had Chad Coogan test a similar starter on our test stand.  The test showed that the starters operate normally with reversed polarity and, therefore, were capable of cranking the engines despite the reversed polarity.

The question of how the radios were energized with the avionics master switch off was answered by information from the schematic of the avionics master switch system and the comments of John Cherney.  John said that he always left individual avionics in the "standby" position, so that they were readily available, if needed, in-flight.  The avionics master switch actually causes voltage to go to the avionics bus with reverse polarity because of the built in default system.  Simply put, the avionics master switch mechanism is "normally on" and requires power to activate it to the "off" condition.  Therefore, during reverse polarity, the switch fails to the "on" position allowing the damaging reverse voltage to flow directly to the avionics.  I have little doubt that the damage occurred exactly as Lou Pugliesi described it to Al Ryan.

## LIABILITY:

The responsibility for this mishap rests solely with MJ Aviation and Lou Puliesi in his capacity as an A&P mechanic.  In the event of a dispute between their

3

insurer (Phoenix) and AIG, this would be an appropriate matter for resolution by the Aviation Claims Manager's Arbitration Counsel.

## DAMAGES:

The issue of whether or not any of the units are repairable in the field is not completely resolved.  We may need some guidance from the manufacturer as to whether they can be repaired, yellow tagged and returned to service.

Rob Lenert says that his contact with King indicates a refusal by King to recognize any residual warranty on these radios following field repair.  Further, Rob said that King recommended decertifying their units and removing the data tags.  Rob was unsure as to whether or not the factory would accept these units as trade-in on remanufactured or new units.  However, some of these units (i.e. GPS) are no longer available new.

John Cherney said that he soon would obtain and, send to Al Ryan, the recommendations from King in writing.

The radios, in their removed condition can readily be sent to any capable and reliable avionics shop for analysis and a "second opinion."

I have advised John Cherney of his responsibility to mitigate the damages as much as reasonable so as not to impair the company's subrogation potential.

It is possible that repairing some of these units, to a serviceable condition, could cost more than obtaining reconditioned yellow tagged units in exchange. Further, the shorter time to put the aircraft back in use would somewhat offset the potential additional cost.  While loss of use is not covered under this 1st party (hull) policy it will be part of the insured's 3rd party claim against MJ Aviation and their insurer.

There are some items, such as autopilot servos which were not subject to any reverse polarity since the autopilot was not engaged but merely in a "standby" condition.

The damage to the aircraft electrical system has not been fully analyzed and must be checked out before other electrical systems can be checked for damage.  VIP is not capable of this analysis.  Therefore, I recommended that John take the aircraft to an FBO at Brainerd which is capable of analyzing and repairing the aircraft primary electrical system including: alternators, voltage regulators, voltage limiters, wiring and solenoids, in an effort to determine the cause of the burned wires and intermittent electrical failures.  This needs to be done before any other systems can be checked out completely.

4

## SUMMARY:

The damage to this aircraft is far more widespread than first anticipated. It is likely that the diagnosis and repair of the aircraft electrical system will cost between $5,000 and $7,000. It is unlikely that the avionics repair or replacement will be less than $50,000 including labor.

## REMAINING TO BE DONE:

1. Obtain information from the manufacturer(s) as to required repair and/or replacement.
2. Have radios analyzed by another facility.
3. Determine damage to aircraft electrical system.
4. Determine what systems could not have been damaged (affected) by the reverse polarity.
5. Document all required repairs to protect the subrogation claim.

Prepared by:

Bernard J. Coogan
Aviation Safety Consultant

Attachment: Seven photographs

5